**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DISABLED IN ACTION OF** | : | |
| **PENNSYLVANIA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| | : | |
| **Defendant** | : | **03-CV-1577** |

**M E M O R A N D U M**

PRATTER, J.                                                           SEPTEMBER 11, 2009

In a case with a long and disputatious history before this Court, the parties once again

seek summary judgment.  Plaintiff Disabled in Action of Pennsylvania (DIA) and Defendant

Southeastern Pennsylvania Transportation Authority (SEPTA) both urge this Court to conclude

the case, brought under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101

et seq., and the Rehabilitation Act of 1973 (RHA), 29 U.S.C. §§ 701, et seq., by ruling

summarily in its favor.  At stake are, according to DIA, the rights of handicapped individuals

who wish to have equal access to Philadelphia public transit, or, according to SEPTA, the

fruitless expenditure of scarce resources.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

DIA is a non-profit corporation that advocates for the civil rights of, and services for,

---

[1] Because previous opinions in this case have fully set forth the factual and procedural
history of the dispute between DIA and SEPTA, see, e.g., DIA v. SEPTA, No. 03-CV-1577,
2006 WL 3392733 (E.D. Pa. Nov. 17, 2006), the Court will seek the benefits of brevity in setting
forth the relevant facts.

persons with disabilities.  DIA Statement of Facts ¶ 1.  SEPTA is "a body corporate and politic which exercises the public powers of the Commonwealth of Pennsylvania as an agency and instrumentality thereof and which provides public transportation in various Southeastern Pennsylvania locales."  SEPTA Resp. to DIA Statement of Facts ("SEPTA Resp.") ¶ 8.  SEPTA operates a "vast network of fixed-route services including bus, subway, subway-elevated, regional rail, light rail, and trackless trolley, as well as customized community service."  DIA Statement of Facts ¶ 9 (quoting DIA Mot. Summ. J. Ex. 3, SEPTA Fiscal Year 2006 Capital Budget, 5).  Many of DIA's members use SEPTA for public transportation.  Id. ¶ 2.

The Market-Frankford Elevated Subway Line is a high speed rapid rail line that runs through the City of Philadelphia.  SEPTA Resp. ¶ 12. The Broad Street Subway Line runs through the City from Fern Rock Station to Pattison Avenue Station.  DIA Statement of Facts ¶ 62.  Both stations at issue in this case, namely the 15th and Market Street Station on the Market-Frankford Line and the City Hall Station on the Broad Street Line, are close to one another in a geographically central location[2] and are interchanges for multiple SEPTA rail lines.  See DIA Statement of Facts ¶¶ 17, 70; SEPTA Resp. ¶¶ 17, 70.  The 15th and Market Streets Station is located underground in the vicinity of 15th Street and Market Street.  DIA Statement of Facts ¶ 15; SEPTA Resp. ¶ 15.  The City Hall Station is located underground in the vicinity of Broad and Market Streets.  DIA Statement of Facts ¶ 56; SEPTA Resp. ¶ 56.

There are two primary means of ingress by which a pedestrian can descend from 15th and Market Streets to the concourse and subway entrances below.  From the southwest side of Market

---

[2] Both of the transit stations are located in the central part of Philadelphia's Center City business district, close to City Hall, various government buildings, and many high-rise office buildings.

Street at 15th Street, a pedestrian may utilize a stairway which leads directly to a concourse area and the Market-Frankford Line cashier booths.  See SEPTA Resp. ¶ 20 ("15th Street Market-Frankford Station has its own street level open-air entrance located at the southwest corner of 15th and Market Streets in an area commonly known as 'the Clothespin.'")  From the northwest side of Market Street at 15th Street, another stairway descends to the 15th Street Courtyard which, if one turns northward, leads to Suburban Station and, if one turns southward and travels about 20 feet, leads to the cashier booths for the Market-Frankford Line.  See SEPTA Resp. ¶ 20 ("[I]n order to reach the 15th Street Market-Frankford Station, an individual who enters the Suburban Station Transit Facility at the 15th Street Courtyard must travel south in the 15th Street corridor, exit Suburban Station, and travel over underground transit lines before entering 15th Street Market-Frankford Station."); June 19, 2009 Tr. at 20, 32.  The parties dispute whether the stairway located on the northwest side of Market Street is an entrance to the 15th Street Market-Frankford Station or an entrance to the Suburban Station transit facility.  DIA Statement of Facts ¶ 20; SEPTA Resp. ¶ 20.

There are several ways to access the City Hall Station on the Broad Street Subway Line. There are two stairways, one at Dilworth Plaza at street level, on the west side of City Hall, which leads to the lower north concourse, and another at street level at the City Hall Courtyard, which leads to the lower south concourse.  DIA Statement of Facts ¶ 65.  There is also a single escalator that runs from the lower south concourse to the southeast portion of the City Hall Courtyard.[3]  DIA Statement of Facts ¶ 66.  From the lower south concourse under the City Hall

---

[3] SEPTA vigorously disputes that this escalator is an "exit" from City Hall Station, contending that it is not.  However, SEPTA admits that it is an exit from the lower south concourse.  See SEPTA Resp. ¶ 65.

Courtyard, a pedestrian can head east, without using any stairs, to reach the 13th Street and 11th Street Stations on the Market-Frankford Line, DIA Statement of Facts ¶ 68; SEPTA Resp. ¶ 68, and can travel east and then south, again without using any stairs, to reach the South Broad Street concourse, the Walnut-Locust Broad Street Subway Station and the Port Authority Transit Corporation (PATCO) station located at 15th and Locust Street.  DIA Statement of Facts ¶ 69; SEPTA Resp. ¶ 69.

Originally, plans to replace the stairway at 15th and Market were included in a project that encompassed renovations in an area bounded by 15th, 18th, Market and Cuthbert Streets. SEPTA Statement of Facts ¶ 6; DIA Resp. ¶ 6.  Ten years ago, on or about September 27, 1999, the United States Department of Commerce notified SEPTA that SEPTA and the City of Philadelphia were the recipients of an Economic Development Administration Award to partially fund a proposed project entitled "Renovation of 15th and Market Streets Headhouse at Suburban Station." SEPTA Mot. Summ. J. Ex. 54 at COP-247.  The Award letter included a "project definition" stating that the project "would involve various renovations to the 15th and Market Street entrances and related areas serving the renovation of entrances to the underground train station concourse; demolition of existing facilities; the construction/installation of new stairs, landscaping, lighting, signage, finishes, canopies; and all appurtenances." Id. at COP-251.  The terms of the Award required that construction commence within 18 months after receipt of the Award and that the construction period would be 29 months.  Id. at COP-250.  Therefore, the construction of the new stairway was put into an "accelerated phase" of the project.  SEPTA Statement of Facts ¶ 21; DIA Resp. ¶ 21.

Prior to the commencement of the construction project prompted by the Award, the

4

entrance at the northwest corner of the 15th and Market Streets consisted of a stairway that descended into the center of a courtyard and two escalators enclosed within a headhouse.  DIA Statement of Facts ¶ 45; SEPTA Resp. ¶ 45.

In February 2001, SEPTA began construction to replace the concrete stairway.  DIA Statement of Facts ¶ 47; SEPTA Resp. ¶ 47.  When the project was concluded, the stairway was replaced and situated along the southeastern wall of the courtyard.  The replacement stairway brings an ambulatory person from street level to the same point within the courtyard as did the old stairway.  See DIA Statement of Facts ¶ 47; SEPTA Resp. ¶ 47.  The parties agree that these stairs were replaced because, due to deterioration of the concrete, the old staircase was beyond repair.  DIA Statement of Facts ¶¶ 50, 53; SEPTA Resp. ¶¶ 47, 53.  The new stairway was opened to the public on August 8, 2002.  DIA Statement of Facts ¶ 58; SEPTA Resp. ¶ 58.  Later, as part of the Suburban Station Renovation Project, two elevators were installed that provided vertical access from street level to the Suburban Station concourse level at JFK Boulevard near 17th Street and on 16th Street between Market Street and JFK Boulevard.  SEPTA Statement of Facts ¶ 16; DIA Resp. ¶ 16.

In August 2003, SEPTA completed the replacement of an escalator in the southeast corner of the City Hall Courtyard.  DIA Statement of Facts ¶ 71; SEPTA Resp. ¶ 71.  The parties agree that the escalator that was replaced had deteriorated and was inoperable.  SEPTA asserts that it reasonably opted to replace the escalator rather than to try to repair it.  DIA Statement of Facts ¶ 72; SEPTA Resp. ¶ 72.  The escalator ascends from the City Hall concourse, one level above the City Hall Station boarding area, to the City Hall Courtyard.  SEPTA Resp. ¶ 73.

The replacement of this escalator was part of the Escalator Replacement Program that

SEPTA initiated in 1999.  DIA Statement of Facts ¶ 73; SEPTA Resp. ¶ 73.  Although the parties

dispute the reason for doing so, SEPTA relocated the truss in the wellway for the new escalator.[4]

DIA Statement of Facts ¶ 75, 76; SEPTA Resp. ¶¶ 75, 76.  The new escalator was installed in the

same wellway that the old escalator had occupied.  SEPTA Resp. ¶¶ 75, 76.  The headhouse of

the escalator bears the words "Broad Street Subway Exit Only."  See Pl.'s Ex. 44 (photograph of

escalator headhouse).

       In this litigation, DIA seeks declaratory and injunctive relief under the ADA and RHA

that would ultimately require SEPTA to modify the Courtyard at the northwest corner of 15th

and Market Street and the exit from the lower southeast concourse to the southeast portion of the

City Hall courtyard to make them accessible to individuals who use wheelchairs.  The procedural

background of this case is fully set forth in the opinion at DIA, 2006 WL 3392733, at *8-10.  In

that opinion, the Court granted SEPTA's motion for summary judgment and denied DIA's

motion for summary judgment.  Specifically, the Court dismissed DIA's Count I on statute of

limitations grounds.  DIA timely appealed the Court's decision, and the Third Circuit Court of

Appeals reversed the Count I portion of this Court's decision to hold that Count I was not barred

by the statute of limitations.  See DIA v. SEPTA, 539 F.3d 199 (3d Cir. 2008).  Upon the remand

of the case here, both parties again filed motions for summary judgment.[5]

---

[4] The truss is the structural piece that physically supports the escalator along its length.
DIA Statement of Facts ¶ 76.  The parties dispute the reason why the truss for the new escalator
needed to be relocated.  DIA contends that the prior escalator had inadequate vertical clearance
for the new escalator, while SEPTA contends that a contractor's mistake resulted in the
replacement escalator lacking the necessary vertical clearance.  DIA Statement of Facts ¶ 75;
SEPTA Resp. ¶ 75.

[5] The present summary judgment motions deal with Count I, the only claim left in the
case.

DISCUSSION

A.    **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. The standards by which a court decides a summary judgment motion do not change when, as here, the parties file cross-motions. SEPTA v. Pa. Pub. Util. Comm'n, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993).

B.    **The ADA and the Rehabilitation Act of 1973**

The ADA and the Rehabilitation Act of 1973 require, as to public transportation facilities, that:

> [w]ith respect to alterations of an existing facility or part thereof used in the provision of designated public transportation services that affect or could affect the usability of the facility or part thereof, it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of Title 29, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.

42 U.S.C. § 12147(a). As previously framed by Third Circuit Court of Appeals, "the relevant question is to what extent any alterations to a facility provide an opportunity to make the facility more accessible to handicapped persons." DIA v. Sykes, 833 F.2d 1113, 1120 (3d Cir. 1987)

(discussing a Rehabilitation Act claim).  The ADA directed the Department of Transportation to

issue regulations to effectuate the provisions of the ADA relating to public transportation and to

do so in a manner consistent with the guidelines issued by the Architectural and Transportation

Barriers Compliance Board.[6]  See 42 U.S.C. § 12149.  The Department of Transportation's

regulations can be found at 49 C.F.R. Part 37.  They state, in pertinent part, that a transportation

facility is readily accessible if it complies with the DOT's regulations and with ADAAG.  See 49

C.F.R. § 37.9.[7]

---

[6] These guidelines are called the ADA Accessibility Guidelines, or "ADAAG," and the portions applicable to the transportation facilities at issue here are the 1991 version of ADAAG. See 49 C.F.R. § 37.9(c); 49 C.F.R. Appendix A.

[7] No Third Circuit court has addressed the issues of the allocation of burdens of proof and persuasion in a case involving alterations under the ADA, either in the context of public transportation facilities or in the context of other types of facilities covered by the ADA, and neither of the parties here has briefed this issue.  The Second Circuit Court of Appeals recently addressed the burdens issue in a Title III case.  See Roberts v. Royal Atlantic Corp., 542 F.3d 363 (2d Cir. 2008).  In Roberts, the plaintiffs claimed that the defendant-resort altered portions of the facility without making them readily accessible to the maximum extent feasible.  See id.  The court borrowed from case law involving "reasonable accommodations" under the Rehabilitation Act in setting out the proper allocation of burdens, holding that a plaintiff bears the burden of production (and "not a heavy one") and must set forth a facially plausible argument that a modification is an alteration and that the alteration could be or could have been made readily accessible.  See id. at 370-72.  Once the plaintiff does this, the defendant carries the burden of persuasion to establish that the modification is not an alteration and/or that the plaintiff's accessibility proposal is impossible in light of the nature of the facility.  The court reasoned that this burden-shifting approach is appropriate because defendants in ADA cases have "superior access" to facility-related information.  See id.
The Third Circuit Court of Appeals has specifically approved of the Second Circuit Court of Appeals' burden-shifting approach in Rehabilitation Act claims.  See Walton v. Mental Health Assoc. of Southeastern Pa., 168 F.3d 661, 670 (3d Cir. 1999) (adopting the Second Circuit approach, and noting that it "places the burden on the party holding evidence with respect to the particular issue").  As the Second Circuit Court of Appeals noted in Roberts, such an approach also makes sense in ADA alterations cases where the defendant has "superior access" to facility-related information.  The Court need not decide whether this approach is the right analytical framework to apply here, however, because the parties here have not attacked each other's positions in terms of having or not having burdens and, in any event, the Court finds that the

No one disputes that SEPTA is a public entity.  Nor does SEPTA challenge DIA's assertion that DIA has standing to pursue this case.  See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (organization has standing when it suffers "concrete and demonstrable" injury, for instance, when its resources must be expended on remedying allegedly discriminatory actions by defendant).  Thus, the present dispute comes down to three questions: 1)  Was the construction done at the 15th and Market Courtyard and/or at the City Hall Courtyard an "alteration" under the ADA?  2) Are the altered facilities "readily accessible?"  3) Is it technically "feasible" for SEPTA to make the altered facilities (or portions thereof) accessible for individuals who use wheelchairs?

    *1.    Alterations*

The first question the Court must answer is whether the construction at issue constituted alterations for purposes of the ADA.  Alterations are defined as:

> a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical or electrical systems are not alterations unless they affect the usability of the building or facility.

49 C.F.R. § 37.3; see also ADA Accessibility Guidelines ("ADAAG") § 3.5 ("An alteration is a change to a building or facility that affects or could affect the usability of the building or facility or part thereof.").  SEPTA contends that the replacement of the stairway at the northwest corner of 15th and Market was not an alteration, and neither was the replacement of the City Hall

---

plaintiff has proved, and the defendant has not disproved, that SEPTA altered its facilities without making them readily accessible to the maximum extent feasible.

Courtyard escalator.  Not surprisingly, DIA claims that both replacements were indeed alterations within the meaning of the law.

There is no dispute that SEPTA demolished the stairs located at the northwest corner of 15th and Market and replaced them with a new set of stairs and that the escalator at City Hall was replaced with an entirely new escalator.  DIA argues that these replacements should be considered alterations and cites two Third Circuit Court of Appeals cases, as well as cases from other circuit and district courts to support its position.  SEPTA counters that the replacements were merely one step along the continuum of normal maintenance and interprets the cases cited by DIA as either distinguishable or wholly inapplicable.

First, DIA cites Kinney v. Yerusalem, 9 F.3d 1067 (3d Cir. 1993).  In Kinney, the Third Circuit Court of Appeals examined the meaning of "alteration."  Plaintiffs had sued the City of Philadelphia, seeking an injunction that would require the City to install curb ramps at intersections when it resurfaced streets.  Id. at 1069.  The parties filed cross motions for summary judgment that turned on the issue of whether street resurfacing constituted an alteration for purposes of the ADA.  Id.  Because resurfacing the street makes driving on and crossing it easier and safer, and prevents damage to vehicles and injury to people, the court upheld the district court's holding that resurfacing enhanced the usability of the street and, therefore, was an alteration.  Id. at 1073-74.  Hence, DIA argues that, as with street resurfacing, the installation of a new stairway or escalator when an old one is unsafe and in disrepair similarly enhances the usability of the stairway or escalator, making the work at issue in this case ADA "alterations."

SEPTA counters that Kinney was decided under different regulations from the ones applicable here, involved a regulatory mandate compelling public entities to lay out a transition

10

plan with regard to the installation of curb cuts, and used Title III criteria "wholly inapplicable to public entities providing mass transportation," rather than Title II criteria. See SEPTA Resp. at 24.[8]

SEPTA also argues that applying the general reasoning of Kinney inappropriately ignores specific guidance applicable to the instant case, namely guidelines that "(1). . .require[] vertical access at an escalator or stair only where none previously existed and major structural modifications are required for the installation, (2). . .require[] only one accessible entrance to a building so long as signage is appropriate, and (3). . . requir[e] only one accessible route from an accessible entrance [in key stations]." Id. at 25.[9]

As to the first guideline that SEPTA contends should be considered here, the referenced regulation states that, "If an escalator or stair is planned or installed where none existed previously and major structural modifications are necessary for such installation, then a means of accessible vertical access shall be provided. . ." ADAAG § 4.1.6(1)(f). ADAAG § 4.1.6(1)(f) does not explicitly say that vertical access is only required under such circumstances. Certainly, one could argue that conclusion is implied, but it is also possible to see this guideline as simply clarifying the requirements in a specific and unequivocal situation without stepping in to the murky waters of other situations involving potential alterations to stairs and escalators. Responding to SEPTA's argument, DIA appears to mischaracterize the requirement regarding

---

[8] DIA counters that the Kinney is not based on Title III, but on Title II, that the alterations requirement there was nearly identical to the alterations requirement at issue in this case, and that the Kinney court relied upon the definition of "alteration" in ADAAG.

[9] The latter reasons 2 and 3 are more appropriately related to the discussion of accessibility, so these arguments will be discussed later.

new stairs and escalators as a requirement covering new construction, despite the fact that the

regulation covers the addition of a staircase or escalator to an existing structure and despite the

fact that the regulation appears in a section of the regulations specifically devoted to alterations.

Regardless, the guideline simply does not state that a means of vertical access must be provided

<u>only</u> when a new staircase or escalator is installed, and the Court refuses to read such a

requirement in to the guideline.

Both DIA and SEPTA purport to rely on <u>DIA v. Sykes</u>, 833 F.2d 1113 (3d Cir. 1987), a

pre-ADA decision.  <u>Sykes</u> concerned renovations to the Columbia Avenue subway station.  <u>Id.</u> at

1114-15.  In that case, one stairway on the northbound side was either partially or entirely

reconstructed, as were two stairways on the southbound side.  On the northeast side, a new

headhouse, two new stairways, and a new escalator were installed.  <u>Id.</u> at 1120.  The court held

that it was "beyond dispute" that the northeast side construction was an "alteration" for purposes

of compliance with applicable regulations.  <u>Id.</u> at 1121.  As to the construction of the stairways

on the southbound side, the appellate court held that it was not clear whether those renovations

amounted to normal maintenance or to an "alteration," and so the court remanded the case for

consideration of this issue.  <u>Id.</u>

The parties disagree as to whether the northbound or southbound construction in <u>Sykes</u> is

more like the present case.  DIA claims that the northbound side demolition and replacement of a

stairway parallels both the 15th Street stairway and City Hall Station escalator reconstruction,

omitting the addition of new stairways and a new escalator in addition to the replacement of the

stairway in that case.  SEPTA, in turn, emphasizes the fact that in <u>Sykes</u> one of the stairways and

escalator were installed where none existed previously.  SEPTA also contends that the remand of

12

the Sykes case as to the southbound side demonstrates that the construction in this present case is

not sufficient to meet the threshold of normal maintenance.  Thus, SEPTA ignores that the Third

Circuit Court of Appeals expressly refused to rule in Sykes on whether the construction on the

southbound side was an alteration, which naturally permits the implication that construction

involving the partial or total reconstruction of an existing stairway could be an alteration, not that

the partial or total reconstruction of an existing stairway is never an alteration under the statute.

All in all, then, the Court concludes that Sykes does not definitively favor either party here.

SEPTA also argues that the replacements of the stairs and escalator do not constitute

alterations because the replacements did not change the access to the station; nor did they

substantially change the locations of the stairs and escalator.[10]  SEPTA points to a letter from

FTA Regional Administrator Sheldon A. Kinbar to SEPTA's general manager, noting that under

the ADA, "where elevators, escalators and other accessibility features exist, they must be

maintained."  See Def.'s Ex. 69.  The author of this letter asks for a schedule for "repair or

replacement" of out-of-service elevators and escalators.

SEPTA contends that these statements, coupled with the absence of any mention that the

replacement of an escalator might trigger a vertical accessibility requirement, show that the FTA

equates "repair" with "replacement" and, therefore, that a replacement "is merely normal

maintenance."  SEPTA emphasizes that no "major structural modifications," such as moving

walls, were involved in the replacement of either the stairway or the escalator.  Rather, in a

straight-faced flourish of euphemistic word-smithing, SEPTA declares that "replacement" is

---

[10] The new stairway was installed at a different starting point but ends at the same place
as the old stairway.

simply the "final act of maintenance" in the normal life of a stairway or escalator.  See SEPTA

Statement of Facts ¶ 45.  SEPTA contends that absent "major structural modifications," usability

and accessibility cannot be affected, and, therefore, no alteration has taken place.  SEPTA also

submits the testimony of expert Donald L. Kloehn, who opines that SEPTA's replacements do

not constitute alterations.  See Def.'s Ex. 50.

DIA responds that SEPTA's argument ignores the plain meaning of the statute, that the

terms "remodeling, renovation, rehabilitation, reconstruction," which are included in the DOT's

definition of alteration at 49 C.F.R. § 37.3, apply here.  DIA also disputes SEPTA's

interpretation of the Kinbar letter, noting that Mr. Kinbar did not discuss any requirements

related to alterations and that his letter was not a comprehensive consideration of all ADA

requirements that could possibly be implicated.[11]  DIA claims that SEPTA's expert, Mr. Kloehn,

misunderstands the ADA's requirements.  DIA suggests that Mr. Kloehn focused on whether a

reconstruction altered the accessibility of a facility, not whether it altered the usability of a

facility, noting that accessibility was the old standard under the Rehabilitation Act.  In this

regard, DIA cites Mr. Kloehn's deposition testimony in which he stated that the replacement of

the stairway could be called remodeling, renovation, and reconstruction.  See Pl.'s Ex. G at 75.

DIA's point regarding the plain language of the governing statute is more persuasive on

this issue.  It is undisputed that (1) the old stairway and escalator were removed and replaced

with a new stairway and escalator, (2) the new stairway and escalator are not the same as the old

---

[11] Both parties appear ready to accept the Kinbar letter as admissible evidence and accept
that its contents could be officially efficacious.  The Court questions those assumptions, but
concludes that even if the parties's assumptions were correct, the letter does not help or
undermine either litigant.

ones, and (3) the old stairway and escalator were in disrepair when replaced.  Indeed, it is difficult to imagine how what was done by SEPTA would <u>not</u> be described by at least one of the four words highlighted by DIA in quoting 49 C.F.R. § 37.3, to wit, <u>remodeling</u>, <u>renovation</u>, <u>rehabilitation</u>, or <u>reconstruction</u>.  The Court finds it inescapable as a conclusion that replacing a stairway that is unsafe and an escalator that is inoperable with a safe stairway and an operating escalator unequivocally enhances the usability of the stairway and escalator portions of the SEPTA facilities.  Hence, the Court holds that the replacements of the stairway and escalator at issue here were alterations under the statute.

      2.    *Accessibility*

      a.     <u>15th and Market Courtyard</u>

In order to come within the reach of the statute at issue here, the alterations must be to "an existing facility or part thereof used in the provision of designated public transportation services."  42 U.S.C. § 12147(a).  As to the 15th and Market Courtyard, DIA and SEPTA appear to agree that it is a facility or part of a facility used in the provision of public transportation services, but the parties diverge when it comes to the question of which facility it is a part of.  Rather than addressing the issue of which station the 15th and Market Courtyard is part of, however, the Court concludes that the choice does not matter.[12]

SEPTA argues that certain of the ADAAG provisions, as well as case law, relieve it from

---

[12] The Third Circuit Court of Appeals noted in its opinion concerning this case that the 15th and Market Courtyard "undisputedly provides access to the Market-Frankford Station," and thus assumed for purposes of that opinion that the Courtyard is an entrance to that Station, leaving it up to this Court to determine the relevance of the issue on remand.  <u>See</u> <u>DIA</u>, 539 F.3d at 202 n.1.  This Court finds that SEPTA has not met the ADA's requirements regardless of which facility, Suburban Station or 15th Street Station, the Courtyard is a part of, so the "geographical" issue is not relevant to liability in this case.

any obligation to provide vertical access at the 15th and Market Courtyard for individuals with wheelchairs if that Courtyard is part of Suburban Station.  SEPTA also argues that even if the Courtyard is not part of Suburban Station, individuals in wheelchairs are able to get to the bottom of the stairs at 15th and Market by taking an elevator at 16th between JFK and Market and traveling through the concourse.  Thus, SEPTA concludes that the 15th and Market Courtyard is already readily accessible.

DIA, on the other hand, argues that the 15th and Market Courtyard is part of 15th Street Station, and because 15th Street Station has no readily accessible entrance, SEPTA was required to provide one when it altered the 15th and Market Courtyard.  In the alternative, DIA contends that even if the 15th and Market Courtyard is part of Suburban Station, the ADAAG does not relieve SEPTA of making the Courtyard accessible to individuals in wheelchairs because the Department of Transportation regulations require more than merely meeting ADAAG's standards and because SEPTA does not, in any event, meet those standards.  DIA also argues that an elevator located 340 feet away from the Courtyard does not make the Courtyard "accessible."

Aside from ADAAG § 4.1.6(1)(f), which SEPTA claims obligates it to install an elevator only if a new staircase or escalator is built where none previously existed (an argument which this Court addressed, supra), SEPTA also cites ADAAG §§ 10.3.2(1), 10.3.2(2) and 4.1.6(1)(h).

Sections 10.3.2(1) and 10.3.2(2) concern requirements for Key Stations, of which Suburban Station is one.  As DIA points out, the Department of Transportation's regulations regarding alterations make clear that the Key Station requirements are "separate from and in addition to" the general alterations requirements.  49 C.F.R. §§ 37.47(a), 37.51(a).  Thus, even if SEPTA is in compliance with the Key Stations guidelines, that does not excuse it from

16

complying with the general alterations guidelines and regulations.[13]

SEPTA also claims that ADAAG § 4.1.6(1)(h) requires only one accessible entrance to a facility, provided that signage is appropriate.  ADAAG § 4.1.6(1)(h) states:

> Entrances: If a planned alteration entails alterations to an entrance, and the building has an accessible entrance, the entrance being altered is not required to comply with 4.1.3(8), except to the extent required by 4.1.6(2). If a particular entrance is not made accessible, appropriate accessible signage indicating the location of the nearest accessible entrance(s) shall be installed at or near the inaccessible entrance, such that a person with disabilities will not be required to retrace the approach route from the inaccessible entrance.

ADAAG § 4.1.6(1)(h).  Section 4.1.3(8), which is specifically referenced, provides minimum requirements for entrances for newly constructed buildings; the portion of that rule that may possibly come into play here is the requirement that a new building must have at least as many accessible entrances as it has fire exits.[14]  However, even if SEPTA has appropriate signage and is exempt from providing as many accessible entrances as it has fire exits, that does not necessarily mean that SEPTA is only obligated to provide one accessible entrance.

DIA apparently has no quarrel with existing signage but counters that if a large facility like Suburban Station only needed to have one accessible entrance, people with disabilities

---

[13] On a related note, with regard to the FTA review that SEPTA argues demonstrates that its Suburban Station renovation project was in compliance with the ADA, see SEPTA Ex. 74, DIA sensibly argues that to the extent the FTA review only looked at whether the renovations met "Key Station" requirements, not all alteration requirements, the FTA approval is of no moment.

[14] The remainder of the guideline directs how many accessible entrances must be part of an accessible route (at least 50%) and how many accessible entrances must be provided for each tenancy in the building; it also sets forth requirements for entrances from garages and tunnels and provides specific guidance for entrances to correctional and judicial facilities.  Thus, whether SEPTA is exempt from these other requirements or not has no bearing on the issues here, as many of them are inapplicable in any case.

would be unacceptably disadvantaged by having to traverse possibly blocks and blocks while non-disabled people could easily access their desired destination.  DIA also points out that the regulations promulgated by the DOT to effectuate the ADA require compliance with ADAAG <u>and</u> with DOT regulations; hence, compliance with ADAAG does not inexorably equal compliance with the ADA.  <u>See</u> 49 C.F.R. § 37.9 (stating that a transportation facility must meet the requirements of ADAAG and the requirements of the DOT regulations to be considered readily accessible).

In addition to this regulation, SEPTA cites several cases which, it argues, hold that one accessible entrance is enough under the guidelines.  SEPTA's confidence in citing these cases is puzzling.  None of them interpret the guideline sections cited by SEPTA, and each is easily distinguishable, as discussed below.

For example, in <u>Kasten v. Port Auth. of NY & NJ</u>, No. 98-CV-4988, 2002 WL 31102689 (E.D.N.Y. Sept. 10, 2002), the court held that one elevator connecting all four floors of an airport terminal was sufficient to comply with the ADA.  <u>Id.</u> at *4.  However, the <u>Kasten</u> plaintiffs did not contend that the subject terminal was either newly constructed or altered; thus, the more restrictive alteration requirements were not triggered.  The court noted in dicta that the guidelines applicable to new construction of airport facilities require at least one accessible route between parking and an accessible building entrance, and that under the circumstances of that case, one elevator would have been enough even if the terminal was newly constructed.  However, of considerable significance for present purposes, the court also noted that "the phrase 'at least one' indicates that the existence of a single accessible route may not suffice in every situation."  <u>See</u> <u>id.</u>; <u>see also, e.g.,</u> <u>Durante v. County of Belknap</u>, No. Civ. 03-333-SM, 2005 WL 361450, at *2

18

(D.N.H. Feb. 16, 2005) (holding that only one accessible entrance was required under the circumstances of that case, but not addressing a situation with alterations or new construction); Long v. Coast Resorts, Inc., 32 F. Supp. 2d 1203, 1212 (D. Nev. 1999) (noting in dicta that "[e]very entrance or exit is not required to be wheelchair-accessible," but certainly not holding that only one entrance to a facility need be accessible in every case).

SEPTA also cites Sykes for the proposition that only one accessible entrance is required. In Sykes, the court did apply a standard that required "at least one primary entrance" to be wheelchair-accessible.  See Sykes, 833 F.2d at 1120.  However, not only does that standard predate both the ADA and the ADAAG, but the court did not address whether the language "at least one primary entrance" should be construed as requiring only one accessible entrance or, as the Kasten court posited, as indicating that "the existence of a single accessible route may not suffice in every situation."  See Kasten, 2002 WL 31102689, at *4.  Indeed, the Sykes court did not explicitly address the issue of whether one or more than one accessible entrance was required.

SEPTA cites two more cases which it argues show that the Courtyard is already readily accessible to disabled individuals because its 16th Street elevator allows individuals in wheelchairs to access the Courtyard:  Hassan v. Slater, 41 F. Supp. 2d 343 (E.D.N.Y. 1999), and Civic Assoc. of the Deaf of NYC, Inc. v. Giuliani, 970 F. Supp. 352 (S.D.N.Y. 1997).  In Hassan, a disabled individual sued railroad operators when they shut down a train station, requiring him to travel an additional four and a half miles to reach an accessible station.  The court ruled against the plaintiff.  See Hassan, 41 F. Supp. 2d at 344-46.  A crucial difference between that case and this one that SEPTA does not address is that in Hassan, the entire facility, i.e., the

19

station, was eliminated for everyone, disabled and non-disabled alike.  While the burden of

traveling extra distances falls more heavily on disabled individuals under such circumstances

than on those who are not disabled, the complete elimination of access for everyone is not as

discriminatory as it would be to force disabled individuals to travel extra distances while non-

disabled individuals do not have to suffer the burden of additional travel.

  In <u>Giuliani</u>, disabled individuals sued the City of New York when the number of street

alarm boxes was reduced, arguing that deaf individuals who had to travel an additional distance

to report an emergency from the street were discriminated against because hearing individuals

could report a street emergency using either the alarm boxes or readily available pay phones.  <u>See</u>

<u>Giuliani</u>, 970 F. Supp. at 359-63.  The court held that there was no alteration, so the question was

not whether the City had an affirmative obligation to make the system readily accessible to the

maximum extent feasible, but rather whether the system was readily accessible as it existed.  <u>Id.</u>

at 361.  The court found that there was not enough evidence regarding accessibility to support

extending a preliminary injunction preventing the City from removing call boxes (or restoring

only some call boxes in certain areas), but, ultimately, the court left the question of accessibility

open.  <u>Id.</u> at 363-64.

  The guidelines and cases cited by SEPTA do not excuse SEPTA for failing to make the

15th and Market Courtyard wheelchair-accessible, regardless of whether it is part of Suburban

Station (which already has accessible entrances), 15th Street Station (which has no accessible

entrance), or both.  Still open, then, is the question of whether the Courtyard is readily accessible

as required by the statute.  SEPTA would have the Court find that an elevator located 340 feet

away makes the Courtyard readily accessible.  DIA would, obviously, have the Court find that

the Courtyard is not readily accessible by the "availability" of the elevator 340 feet away.

Counsel for DIA pointed out that a wheelchair-bound individual who wanted to get to the bottom

of the 15th and Market Courtyard would have to travel 680 feet more than a person who is not in

a wheelchair (340 feet to the elevator from 15th and Market and 340 feet back to the Courtyard).

At oral argument, SEPTA's response to this dose of physical reality amounted to little more than

a verbal shrug, acknowledging the basic accuracy of the distance calculation.

Requiring individuals in wheelchairs to travel more than the length of two football fields

to reach the same point that everyone else can reach without such effort flies in the face of the

principles of equal access promoted by the ADA.  The Court notes that this same principle is

expressed in ADAAG § 10.3.1(1), a guideline governing the new construction of fixed facilities

and stations for public transportation, which states that "[e]lements such as ramps, elevators or

other circulation devices, fare vending or other ticketing areas, and fare collection areas shall be

placed to <u>minimize the distance</u> which wheelchair users and other persons who cannot negotiate

steps may have to travel compared to the general public."  (emphasis added.)  Although this

guideline does not apply directly to the alterations here, it affirms that minimizing extra travel

burdens on those with disabilities is an important consideration for public transportation

facilities.  Thus, the Court concludes the 15th and Market Courtyard as SEPTA has now

configured it is not readily accessible to individuals with disabilities.

      b.      City Hall Courtyard

As to the escalator from the concourse level to street level at the southeast corner of the

City Hall Courtyard, SEPTA claims that it is not part of the City Hall Broad Street Station, but

rather is part of the lower south concourse.  SEPTA points out that to get from the bottom of the escalator to the platform, a person must traverse the mezzanine to the ticket booths, go through a turnstile and take a flight of stairs to either the north- or south-bound platforms (i.e., access from platforms to the escalator is not direct).

To prove that the escalator is part of City Hall Station, DIA cites to minutes of a April 20, 2001 meeting between SEPTA and the City of Philadelphia which discusses the replacement of the escalator at "City Hall Station (Southeast entrance)" (Pl.'s Ex. 42), as well as renovation schematics labeled "City Hall Station Renovations" that show the escalators, Pl.'s Exs. 33, 34, and photographs showing the escalator headhouse on which the words "Broad Street Subway, Exit Only" appear, Pl.'s Ex. 44.

With respect to the issue of whether the escalator is an exit from (and therefore a part of) City Hall Station, the Third Circuit Court of Appeals called SEPTA's definition of "exit" "hyper-technical." DIA v. SEPTA, 539 F.3d at 205 n.8.  The photograph showing the escalator as clearly labeled "Broad Street Subway Exit Only" suggests that SEPTA's argument is not only hyper-technical, but also disingenuous.  What SEPTA seems to be trying to achieve with its "hyper-technical" definition is significant inasmuch as providing an elevator at the location where the escalator is found will not allow disabled individuals to access the platform of the station.  While this is undoubtedly true, that fact does not make the escalator any less a part of City Hall Station.  As DIA argues, the ADA speaks of alterations to a facility or "a part thereof," see 42 U.S.C. § 12147(a), and the ADA is an incremental statute.  Given that eventually SEPTA will alter the stairway to the platform, triggering a requirement of additional accessibility, at that point, wheelchair-bound individuals will have an accessible exit waiting for them at the

22

mezzanine level.

Having concluded that the escalator is a part of City Hall Station, the next question, then, is whether the altered portion of City Hall Station at issue is readily accessible. There are no guidelines regarding exits. The evidence before the Court, then, is that none of the exits (or entrances that also serve as exits) directly from City Hall Station are accessible. Unlike with the 15th and Market Courtyard, SEPTA does not argue that the escalator at City Hall Station is otherwise readily accessible.[15] Thus, the Court concludes the City Hall Courtyard escalator is not readily accessible to individuals with disabilities.

### 3.   Feasibility

The final piece of the puzzle is to determine whether it is technically feasible to grant DIA the relief it seeks. The ADA requires that when alterations are made, they should be completed "in such a manner that, to the <u>maximum extent feasible</u>, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." <u>See</u> 42 U.S.C. § 12147(a) (emphasis added). According to the Department of Transportation ADA regulations, "the phrase to the maximum extent feasible applies to the occasional case where the nature of an existing facility makes it impossible to comply fully with applicable accessibility standards through a planned alteration." 49 C.F.R. § 37.43(b). Thus, contrary to what one might consider–especially during times of inescapable

---

[15]   The parties spent relatively little time in their briefs and at oral argument on the City Hall Station issues, as compared to the 15th and Market Courtyard issues. Given the level of intense engagement exhibited by both parties in this case, however, the Court assumes that if an argument was to be made regarding whether the City Hall Courtyard escalator was readily accessible, it would have appeared in the parties' briefs.

economic challenges in the public and private sectors–under the governing legislation and related

regulations, the only considerations to be made when determining whether an alteration was

made in an accessible manner to the maximum extent feasible are those of technical feasibility,

not economic feasibility.  Cf. Title III Final Rule, 56 Fed. Reg. at 35,581 (Department of Justice

comments on similar provision applying to Title III cases, which states: "The legislative history

of the ADA indicates that the concept of feasibility only reaches the question of whether it is

possible to make the alteration accessible in compliance with this part.  Costs are to be

considered only when an alteration to an area containing a primary function triggers an additional

requirement to make the path of travel to the altered area accessible.")

   a.  15th and Market Courtyard

  DIA argues that Terry G. Heiser, a professional engineer employed by SEPTA as a Senior

Project Manager, stated in a March 14, 2006 affidavit, "If the Court were now to order that an

elevator should be built in the 15th Street Courtyard, it would take approximately three years to

design and construct an elevator in that location.  I approximate the total cost of such an elevator

to be $810,000."  Def.'s Ex. 23 at ¶ 8.  Therefore, DIA argues, the addition of an elevator to the

15th and Market Courtyard is "feasible."  Trying to retreat from the impact of its engineer's

affidavit, SEPTA replies in its response to DIA Statement of Facts ¶ 60, that at his deposition,

Mr. Heiser said that it was "probably" feasible to install an elevator, that he would "have to see

what the interferences are going down there," and that the likelihood of feasibility was "more

than 50/50."  See Pl.'s Ex. 24, Heiser Dep. at 54, lines 11-21.  However, in a June 26, 2009 letter

in which SEPTA clarified its position regarding whether an elevator could feasibly be installed

("June 26, 2009 Letter"), SEPTA disputed the feasibility of installing an elevator at the City Hall

Courtyard, but, as to the 15th and Market Courtyard, rested on its argument that only one entrance to a facility be made accessible without pursuing the feasibility issue. Noting also that Mr. Heiser's affidavit followed his deposition by some five months, the Court finds that SEPTA could feasibly install an elevator at the 15th and Market Courtyard.[16]

     b.    City Hall Courtyard

As to the City Hall Courtyard, the evidence issue is largely similar. DIA argues that Skip Brooke, a professional architect and SEPTA's Director of Engineering in the Bridges and Buildings Department, stated in an affidavit that "[t]he approximate cost to install one elevator in the City Hall Courtyard would be approximately $2 million." See Def.'s Ex. 35 at ¶ 36. It also cites to deposition testimony in which Mr. Brooke stated that "[a]s far as I know, it is technically feasible to install an elevator in [City Hall Courtyard to the concourse level]." See Brooke Dep., Pl.'s Ex. 35 at p. 95, lines 14-16. SEPTA's response is that Mr. Brooke's testimony is "not unequivocal." See June 26, 2009 Letter. SEPTA points to another portion of Mr. Brooke's deposition in which he testified that "[f]rom an engineering point of view, virtually anything is feasible." See Brooke Dep., Pl.'s Ex. 35 at p. 82, lines 24-25. At that point in the deposition, SEPTA's counsel volunteered that Mr. Brooke was not the "right person to ask" about technical

---

[16] Following the Second Circuit Court of Appeals' approach with respect to burden allocation in Roberts, discussed supra, DIA needed to set forth a facially plausible option to make the altered portion of the facility readily accessible; SEPTA then bore the burden of showing that the option was not feasible. Certainly, SEPTA has failed to present any evidence that an elevator could not be installed at 15th and Market. However, even assigning the burden entirely to DIA, the Court finds that DIA has presented the sworn affidavit of one of SEPTA's own employees estimating the cost and time required to install an elevator at that location, which is uncontradicted by any other evidence. Nowhere does SEPTA's engineer suggest that installation of an elevator is not feasible.

feasibility.  See id. at p. 83, line 14.  Of course, counsel's gratuitous (and possibly improper)

comment during the deposition is of no evidentiary value.  However, SEPTA also points to Mr.

Brooke's testimony that he and his department did not develop any vertical accessibility plans for

City Hall Station.  See id. at p. 122, lines 6-11.  While Mr. Brooke's deposition testimony is "not

unequivocal," Mr. Brooke's affidavit clearly lays out the cost and time to install an elevator at the

City Hall Courtyard, and neither his deposition testimony nor any other evidence contradicts the

concept of the feasibility of such an installation.

SEPTA also argues that because the City of Philadelphia owns the Courtyard, SEPTA

would need the City's permission to install an elevator.  SEPTA then notes that DIA did not

present any evidence regarding the willingness of the City to allow such an installation.  Given

the City's settlement with DIA, which settlement explicitly granted permission for the

installation of an elevator at 15th and Market Courtyard and at least some locations at City Hall

Station (albeit not at the location discussed here), see Docket No. 49, there is no evidence from

which to reasonably that the City would not allow the installation of an ADA-compliant elevator

at the City Hall Courtyard.  In fact, the settlement agreement strongly suggests that the City

would not oppose such a plan.  Thus, the Court finds that SEPTA could feasibly install an

elevator at the City Hall Courtyard.[17]

--------------------------------------------------

[17] SEPTA also argues, by citation to 49 C.F.R. § 37.43(a)(2) and (e)(1), that it would be
absurd to require SEPTA to spend $2 million more on a $1.2 million project.  However, the
"path of travel" provision that SEPTA invokes to support this argument of disproportionate cost
does not apply here.  That provision states that when an alteration is made that affects the
usability of an area of a facility containing a primary function, the path of travel to the altered
area must also be made accessible, unless the cost is disproportionate to the cost of the
alterations.  This provision only applies when the cost to alter the path of travel is
disproportionate, not when the cost of making the alteration itself is disproportionate to an

**CONCLUSION**

For the reasons discussed above, summary judgment with respect to Count I of the Fourth Amended Complaint will be entered in favor of DIA.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge

---

alteration done without accessibility considerations.  Moreover, as noted above, under the actually applicable legislative and regulatory scheme, cost is not a relevant factor in considering the feasibility of an accessibility feature.

27